[Cite as *State v. Hightower*, 2012-Ohio-1959.]

COURT OF APPEALS
DELAWARE COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| STATE OF OHIO | JUDGES:<br>Hon. Patricia A. Delaney, P.J. |
| Plaintiff-Appellee | Hon. William B. Hoffman, J.<br>Hon. Sheila G. Farmer, J. |
| -vs- | |
| | Case No. 11CAA080071 |
| BRANDON M. HIGHTOWER | |
| Defendant-Appellant | O P I N I O N |

CHARACTER OF PROCEEDING:     Appeal from the Delaware County Court of
                             Common Pleas, Case No. 11CRI030146A

JUDGMENT:                    Affirmed

DATE OF JUDGMENT ENTRY:      April 18, 2012

APPEARANCES:

For Plaintiff-Appellee                 For Defendant-Appellant

CAROL HAMILTON O'BRIEN                 WILLIAM T. CRAMER
Prosecuting Attorney                   470 Olde Worthington Road, Suite 200
ERIC C. PENKAL                         Westerville, Ohio 43082
Assistant Prosecuting Attorney
140 N. Sandusky Street 3rd Floor
Delaware, Ohio 43015

*Hoffman, J.*

{¶1}    Defendant-appellant Brandon M. Hightower appeals his conviction entered by the Delaware County Court of Common Pleas.  Plaintiff-appellee is the state of Ohio.

STATEMENT OF THE FACTS AND CASE

{¶2}    On March 7, 2011, Appellant and Anthony McClain were travelling in a vehicle on Interstate 71.  Deputy Paul Simpson of the Delaware County Sheriff's Department observed the vehicle travelling over the speed limit, and the rear license plate covered by a tinted plastic covering.  As a result, Deputy Simpson initiated a traffic stop.

{¶3}    Upon approaching the vehicle, Deputy Simpson noticed a smell of raw marijuana emanating from the vehicle.  Sergeant Larry Dore of the Delaware County Sheriff's Office who had responded to the scene to assist Deputy Simpson, had his K-9 unit conduct a walk-around of the vehicle.  The dog indicated on the vehicle for drugs. Deputy Simpson then asked Appellant and McClain to exit the vehicle.  Instead, Appellant fled the scene of the traffic stop at a high rate of speed leading the officers on a high speed chase.

{¶4}    During the chase, a weapon and drugs were thrown from the passenger side of the vehicle.  While Appellant or McClain were disposing the evidence, Deputy Simpson and Sergeant Dore witnessed Appellant run through several red lights, swerve in and out of traffic, go left of the roadway, and travel in excess of 90 mph in a high traffic commercial area.  Further testimony established Appellant traveled in excess of 60 mph in a 35 mph zone.

{¶5}   As a result, Appellant was charged with failing to comply with an order or signal of a police officer, thereby causing a substantial risk of serious physical harm to persons or property, in violation of R.C. 2921.331(B) and (C)(5)(a)(ii); tampering with evidence, in violation of R.C. 2921.12; having a firearm while under disability, in violation of R.C. 2923.13; and trafficking in marijuana, in violation of R.C. 2925.03.

{¶6}   During trial, the court dismissed the having a firearm under disability charge for lack of evidence pursuant to Criminal Rule 29.  The jury subsequently found Appellant not guilty of trafficking in marijuana, but guilty of the failure to comply and tampering with evidence charges.  The trial court sentenced Appellant to two years for failure to comply and one year for tampering with evidence, to be served consecutively. The trial court also imposed a fine of $3,500 and a six year driver's license suspension.

{¶7}   Appellant now appeals, assigning as error:

{¶8}   "I. APPELLANT WAS DEPRIVED OF HIS RIGHTS TO DUE PROCESS AS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND SECTION 16, ARTICLE I OF THE OHIO CONSTITUTION BECAUSE THE PROSECUTION FAILED TO PRESENT SUFFICIENT EVIDENCE THAT APPELLANT'S OPERATION OF A MOTOR VEHICLE CAUSED A SUBSTANTIAL RISK OF SERIOUS PHYSICAL HARM TO PERSONS OR PROPERTY.

{¶9}   "II. THE JURY'S FINDING THAT APPELLANT'S OPERATION OF THE MOTOR VEHICLE CAUSED A SUBSTANTIAL RISK OF SERIOUS PHYSICAL HARM TO PERSONS OR PROPERTY WAS NOT SUPPORTED BY THE WEIGHT OF EVIDENCE."

I, II.

{¶10} Appellant's first and second assignments of error raise common and interrelated issues; therefore, we will address the arguments together.

{¶11} On review for sufficiency, a reviewing court is to examine the evidence at trial to determine whether such evidence, if believed, would support a conviction. *State v. Jenks* (1991), 61 Ohio St.3d 259. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Jenks* at paragraph two of the syllabus, following *Jackson v. Virginia* (1979), 443 U.S. 307. On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine "whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin* (1983), 20 Ohio App.3d 172, 175. See also, *State v. Thompkins,* 78 Ohio St.3d 380, 1997–Ohio–52. The granting of a new trial "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Martin* at 175.

{¶12} We note the weight to be given to the evidence and the credibility of the witnesses are issues for the trier of fact. *State v. Jamison* (1990), 49 Ohio St.3d 182, certiorari denied (1990), 498 U.S. 881. The trier of fact "has the best opportunity to view the demeanor, attitude, and credibility of each witness, something that does not translate well on the written page." *Davis v. Flickinger,* 77 Ohio St.3d 415, 418, 1997–Ohio–260.

**{¶13}** Appellant was convicted of violating R.C. 2921.331(B)(C)(5)(a)(ii), which reads:

**{¶14}** "(B) No person shall operate a motor vehicle so as willfully to elude or flee a police officer after receiving a visible or audible signal from a police officer to bring the person's motor vehicle to a stop.

**{¶15}** "(C)(1) Whoever violates this section is guilty of failure to comply with an order or signal of a police officer.

**{¶16}** "***

**{¶17}** "(5)(a) A violation of division (B) of this section is a felony of the third degree if the jury or judge as trier of fact finds any of the following by proof beyond a reasonable doubt:

**{¶18}** "***

**{¶19}** "(ii) The operation of the motor vehicle by the offender caused a substantial risk of serious physical harm to persons or property.***"

**{¶20}** At the trial in this matter, Deputy Paul Simpson testified:

**{¶21}** "Q. Did you ever lose sight of Mr. Hightower throughout this car chase?

**{¶22}** "A. No.

**{¶23}** "Q. Where did Mr. Hightower go?

**{¶24}** "A. As we approached the off-ramp, at that point you got your left lane is going to be headed eastbound on 36/37, your right lane is going to be headed westbound on 36/37 and that's all there is, there's no straight lane, just left and right. There was probably maybe eight or ten cars in each lane. Eastbound and westbound pretty much they were sitting stuck at the light. And at that point Mr. Hightower then

went to the left and between the far left lane as well as the guardrail. And at that point he proceeded up to the ramp. The light was still red, he rounded the corner, cut in front of both the lanes sitting there and proceeded westbound on 37.

**{¶25}** "* * *

**{¶26}** "Q. How fast do you recall the defendant get up to speed-wise as he approached 36/37 exit?

**{¶27}** "A. I would say by the time he hit the top of the off-ramp, I would say probably 60, 70 miles an hour.

**{¶28}** "Q. You said that there's two lanes of travel for the exit for 36/37 right there?

**{¶29}** "A. Yes.

**{¶30}** "Q. Was there vehicles stopped at the stop light in both lanes of travel?

**{¶31}** "A. Yes, sir.

**{¶32}** "The Court: He already testified to that. He also said how many vehicles there were in each lane.

**{¶33}** "By Mr. Penkal:

**{¶34}** "Q. Did you - - were you right behind the defendant?

**{¶35}** "A. Yes, sir.

**{¶36}** "Q. How far away from you - - how far were you from the vehicles parked in the eastbound lane as you were traveling up the off-ramp?

**{¶37}** "A. It was a very tight fit, I would say darn near rubbing beards, I don't know it was pretty tight.

**{¶38}** "Q. Did you see the vehicle, the defendant's vehicle turn on 36/37?

**{¶39}** "A. Yes.

**{¶40}** "Q. Did he cause any sort of disturbance there?

**{¶41}** "A. I just noticed there was vehicles trying to make the right-hand turn on the red and I saw them locking up their brakes and hearing the tire screeches and locking up.

**{¶42}** "Q. What is the speed limit on 71?

**{¶43}** "A. It's 65.

**{¶44}** "Q. After he turned onto 36/37, did you continue your pursuit?

**{¶45}** "A. Yes.

**{¶46}** "Q. Can you describe for the jury what the defendant did?

**{¶47}** "A. At that point we're now westbound on 36/37 headed towards Delaware City and again there's - - it's heavy traffic in between there with the stop lights and everything. Everyone is pretty much bumper to bumper. At that point he went around to the right on the BP side, I guess, would be the north side of 36/37, cutting in and out of the traffic there, blew through the red light at the intersection, the commercial intersection, I guess, still proceeding westbound, leaving the roadway and going off on the driveways and everything coming back onto 36/37, again, cutting in and out of traffic. As you come to Four Winds or you might look at it as the Cracker Barrel intersection, again blowing through that light. There was cars coming off of Four Winds having to jam up their brakes, trying to avoid being hit or hitting anybody else. And, again, proceeding westbound on 36/37.

**{¶48}** "Q. And that commercial area you described, how was the traffic there that day?

**{¶49}** "A. It was heavy.

**{¶50}** "Q. Who was following the defendant at this point in time in the commercial area?

**{¶51}** "A. I stuck to left of the defendant, instead of going to the right of all the traffic, I proceeded to the left. Sergeant Larry Dore was directly behind and taking the same route.

**{¶52}** "Q. After they got past Four Winds, describe for the jury what happened next.

**{¶53}** "A. At that point obviously it jumps from 35 to 55 so you get a little bit more distance between cars. At that point that's when, I guess, we reached our top speed of the whole incident around 90 miles an hour still weaving in and out of what traffic was on that road. Weaving through them, they kind of parting out of the way.

**{¶54}** "Q. The vehicles that parted, did they leave the roadway?

**{¶55}** "A. Yes.

**{¶56}** "Q. Did you see anything leave the vehicle at this point in time?

**{¶57}** "A. I saw - - as we were coming across - - it seemed like right as we're approaching the Alum Creek area, I saw like green particles or like a - - almost like a fog of just, like, green flakes, I guess, coming back in myself and Sergeant Dore's direction. It was obviously being tossed from the vehicle."

**{¶58}** Tr. at 121-122; 123-126.

**{¶59}** Michael Strawbridge, a truck driver who observed the incident at issue, testified:

**{¶60}** "Q. Do you remember an incident on March 7th, 2011?

**{¶61}** "A. Yes, I do.

**{¶62}** "Q. Where were you that day?

**{¶63}** "A. I was coming down 71 and I come up off the exit to get on 36 to go around Columbus so I didn't have to go through the city.  And stopped at the end of the ramp, there was a red light there.  I was wanting to turn right on red, but it was just turning red and I didn't want to take a chance and the light turned green and I started to go out and when I did, a car come flying up around my left side and cut in front of me.  I hit my brakes so I wouldn't hit it and I seen something fly from the right front door.  And then I seen a sheriff car come behind it and another sheriff car.  And the car went to the right around a car and the sheriff cars chased it.  And I thought maybe that was something being thrown out the window.

**{¶64}** "Q. What did you do?

**{¶65}** "A. I pulled over to the side of the road.  I thought I'd go back and look and I walked about 50 feet back and there right where the ramp hits 36, there was a gun.

**{¶66}** "And my car ran over the gun just as I was coming up on it.  And I thought, don't get involved, you're going to end up down here testifying.  And I thought, well, right is right.  So I went over and I grabbed my handkerchief and picked the gun up by the barrel and put it in my truck and drove on down the road hoping that they caught them somewhere down the road."

**{¶67}** Tr. at 137-158.

**{¶68}** Sergeant Dore then testified:

**{¶69}** "Q. So you guys both go to your vehicles, what do you [sic] at that time?

**{¶70}** "A. We both obviously take off after him. I aired that he was running. I aired that the dog had indicated on the vehicle. Deputy Simpson is actually the lead car in the lead car so I think at one point in there I said I'll call it.

**{¶71}** "We tried to - - we were in the process of trying to catch up with them, they exited off the ramp to 36/71. We're in the left side or the berm area going around the traffic that was stopped. I remember seeing traffic going back and forth on the bridge and thinking to myself this is not going to be good.

**{¶72}** "He made a right turn, front right turn in front of - - I think there was a car, I know there was a semi, like, a red semi, I think it was a dump truck or one of those container trucks. He turned, lost sight of him briefly. We had slowed down for traffic to make sure we didn't hit anybody, and went westbound on 36/37.

**{¶73}** "Q. Deputy Simpson's vehicle still had his flashers on at that point?

**{¶74}** "A. Yes.

**{¶75}** "Q. Any audible warning systems?

**{¶76}** "A. Well, I know I had my siren on so - - I couldn't hear his.

**{¶77}** "Q. Your flashers on your cruisers are on as well too?

**{¶78}** "A. Yes.

**{¶79}** "Q. What was traffic like on that exit ramp?

**{¶80}** "A. It's busy. It's an area where you have a couple truck stops to the east, three hotels to the west and north of that exit, restaurants, gas stations, there's a Starbucks there. A lot of truck drivers will park their rigs over in the truck stops and walk across the bridge to get something to eat because there's no truck parking there. It's a pretty busy, it's a 35 miles an hour zone.

**{¶81}** "Q. How fast was the defendant traveling up the exit ramp?

**{¶82}** "A. If I had to guess, 60ish.

**{¶83}** "Q. As you're going up there, who has the red light for that intersection?

**{¶84}** "A. As I recall we had a red light because there was cars - - traffic crossing in front of us.

**{¶85}** "Q. Did the defendant stop at that red light?

**{¶86}** "A. No, he did not.

**{¶87}** "Q. What did he do at that turn?

**{¶88}** "A. I mean, he obviously had to slow down and he just turned right, turned in front of all the cars that were getting at the off-ramp.

**{¶89}** "Q. What lane was he in?

**{¶90}** "A. He was in the left berm so he had two lanes of travel and he came up around them.

**{¶91}** "Q. Turn signal there again?

**{¶92}** "A. I don't remember seeing a turn signal.

**{¶93}** "Q. Did he yield for traffic?

**{¶94}** "A. No.

**{¶95}** "Q. Where did you guys go as the defendant is traveling up the left berm of the exit ramp?

**{¶96}** "A. We have to follow-up the left berm because the traffic stopped.

**{¶97}** "Q. How much room do you guys have?

**{¶98}** "A. Ten feet, 15 feet, somewhere in there.

**{¶99}** "Q. Where did the chase go from there?

**{¶100}** "A. Like I said, the vehicle turns right, which is westbound and I can't see him now.  We get up, as soon as we make our turn, then I can see the vehicle going in and out of cars.

**{¶101}** "I, you know, we're speeding up at this point obviously giving the location, trying to get spikes set up ahead of us so we can stop this.

**{¶102}** "The vehicle went through another traffic light there at the BP Gas Station, which was red.  The vehicle drove into the berm on the right side of the road, I followed behind him and Deputy Simpson actually, I believe, went to the left into the middle of the intersection and then came in - - he was still the primary vehicle.

**{¶103}** "Q. First of all, you said weaving in and out of traffic: which direction was this traffic going?

**{¶104}** "A. The traffic he was weaving in and out of was going westbound, same direction.

**{¶105}** "Q. What's the speed limit there?

**{¶106}** "A. Thirty-five.

**{¶107}** "Q. Thirty-five.  You said there's a light by BP?

**{¶108}** "A. Yes.

**{¶109}** "Q. Was there traffic going essentially north or southbound through that intersection, perpendicular to where you were traveling?

**{¶110}** "A. Yes.

**{¶111}** "Q. What was that - - what happened to that traffic at that light?

{¶112} "A. I mean, they didn't hit anybody going through the intersection. Of course, I know we yielded - - I yielded enough so they heard us and saw us before I proceeded through the red light.

{¶113} "Q. From there, after that red light, where did he go?

{¶114} "A. He continued westbound. I think it was at this point I saw something come out of the vehicle. I aired on the radio a gun or a scale, but it hit the pavement and shattered into pieces.

{¶115} "Q. Where did this happen at?

{¶116} "A. West of that light, but before 3B's and K Road.

{¶117} "Q. What side of the vehicle did it come out of?

{¶118} "A. Passenger window.

{¶119} "Q. How fast are you traveling at that point?

{¶120} "A. I think we're going about 70, 70 to 80, somewhere in there.

{¶121} "Q. Is still 35 at that time?

{¶122} "A. Yes.

{¶123} "Q. What's traffic like right, I guess, in that area around 3B's and K?

{¶124} "A. It's busy - - I mean it's almost rush hour traffic so it's always busy.

{¶125} "Q. Busy that day as well?

{¶126} "A. Yes.

{¶127} "Q. What happened after you see that first time thrown out?

{¶128} "A. As I said, I aired it. We continue westbound, I think around 3B's and a K I actually got on the radio and told Deputy Simpson to back off a little. We were again trying to get spikes set up. And we were approaching Alum Creek and just before going

onto the bridge I saw a baggie come out of the window and it looked, you know, from my view, it looked like he was crumbling something. And then I was just seeing - - just actually described on the radio a green cloud, which I believed to be marijuana come out it, a blue bag, like a Kroger, one of the Walmart or Kroger bags and then the bag came out.

{¶129} "Q. What side did that come out?

{¶130} "A. Passenger.

{¶131} "Q. And you could see hands?

{¶132} "A. Yeah, I mean, I could see - - I mean, I could see the hands, I could see the bag in the wind and I could see just the cloud coming, coming, coming and the bag go.

{¶133} "Q. And you said you thought you saw marijuana?

{¶134} "A. Yeah, I'm pretty sure it was marijuana.

{¶135} "Q. What was the size and diameter of the marijuana?

{¶136} "A. You know it's a - - just it looks like a small volley ball, I guess, like - - it looks like somebody was crumbling a brick, if I had to take a guess. Both his hands are out going like this. (Indicating) So it's kind of hard to tell.

{¶137} "Q. How long did this go on for?

{¶138} "A. Probably 30 seconds. I mean, it was pretty quick because it happened three times altogether, three different rounds of marijuana coming out of the car.

{¶139} "Q. How fast were you guys going?

{¶140} "A. I think 90 - - 90 to 100, somewhere around there.

{¶141} "Q. Speed limit in this area is?

**{¶142}** "A. It transfers over to 55 just at 3B's and a K, so 35 to 55.  I mean we were 80 in a 35 and, of course, we're speeding up the whole way through intersection.  I mean, it's 55 speed limit at 3B's and K.

**{¶143}** "Q. What's traffic like at that area by Alum Creek?

**{¶144}** "A. It kind of thinned out a little bit, because you don't have all the people going in and out of Cracker Barrel and businesses.

**{¶145}** "Q. Are there roads intersecting with 36/37 there?

**{¶146}** "A. Yes.

**{¶147}** "Q. What are those roads in there?

**{¶148}** "A. Three B's and a K south, that comes in to 36/37 there by the ODOT garage and just beyond that is 3B's and a K north and then down is half of a road with an automobile dealership, used to, and then after that you have the long bridge.

**{¶149}** "Q. What about the other side?

**{¶150}** "A. You have what we call 10A, Duncan Run Road, I think, then North Old State Road, then it would be Big Run Road, and then there's the Humane Society, then there's Old State Road, which is where they actually went past that to Plunkett and were slowing down at that point.

**{¶151}** "Q. Was there any traffic on 36/37 other than the officers and the defendant?

**{¶152}** "A. Yes.

**{¶153}** "Q. What was that traffic?

**{¶154}** "A. It started to yield to them.  We had one driver was screaming and yelling at the defendants.  When we finally got them stopped, they were mad.  But there was, I mean, there was moderate traffic."

**{¶155}** Tr. at 182-189.

**{¶156}** Based upon the testimony cited above, we find there was competent, credible evidence supporting all of the elements of Appellant's conviction, and the jury did not lost its weigh in convicting Appellant of the charges.  The evidence clearly demonstrates Appellant operated his vehicle causing a substantial risk of serious physical harm to persons or property, while failing to comply with an order or signal of a police officer.

**{¶157}** The judgment of the Delaware County Court of Common Pleas is affirmed.

By: Hoffman, J.

Delaney, P.J.  and

Farmer, J. concur

s/ William B. Hoffman_____
HON. WILLIAM B. HOFFMAN


s/ Patricia A. Delaney_____
HON. PATRICIA A. DELANEY


s/ Sheila G. Farmer_____
HON. SHEILA G. FARMER

IN THE COURT OF APPEALS FOR DELAWARE COUNTY, OHIO
FIFTH APPELLATE DISTRICT

STATE OF OHIO                          :
                                       :
    Plaintiff-Appellee             :
                                       :
-vs-                                   :         JUDGMENT ENTRY
                                       :
BRANDON M. HIGHTOWER                    :
                                       :
    Defendant-Appellant            :         Case No. 11CAA080071


For the reason stated in our accompanying Opinion, the judgment of the

Delaware County Court of Common Pleas is affirmed. Costs to Appellant.


s/ William B. Hoffman_____
HON. WILLIAM B. HOFFMAN


s/ Patricia A. Delaney_____
HON. PATRICIA A. DELANEY


s/ Sheila G. Farmer_____
HON. SHEILA G. FARMER